U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.



**Signed May 13, 2008**
                                       **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 05-86866-BJH-7** |
| **KEVIN SCOTT MIXON and** | § | |
| **JAMIE J. MIXON,** | § | |
| | § | |
| Debtors. | § | Chapter 7 |

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| Plaintiff, | § | |
| | § | |
| - against - | § | **ADVERSARY PRO. NO. 07-3257** |
| | § | |
| **KEVIN SCOTT MIXON and** | § | |
| **JAMIE J. MIXON,** | § | |
| Defendants. | § | |

### <u>MEMORANDUM OPINION</u>

Before the Court is the complaint by the United States of America against Kevin Scott Mixon

and his wife, Jamie J. Mixon (the "Debtors" or "Mixons"). The United States, on behalf of the Internal Revenue Service ("IRS"), filed this complaint (the "Complaint") seeking (1) a determination that the Debtors are indebted to the IRS in the amount of $730,117.24 for federal income taxes for tax years 1998 through 2002,[1] (2) to recover this debt from the Debtors, along with interest after the bankruptcy petition date until paid, and (3) a determination that the debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C) because the Debtors have "willfully attempted in any manner to evade or defeat such tax." The Court has core jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334. A bench trial of this matter was conducted on February 7, February 8, March 17, and March 19, 2008. The Court heard the testimony of Scott Seidel, Kevin Mixon, Jamie Mixon, David Mixon, Jim Campbell, Robert Wilson, Chris Darrington and Alan Barker. Closing arguments were heard on March 26, 2008. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law, based upon the evidence and arguments presented.

## I.    Background

The Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on November 17, 2005 (the "Petition Date"), which was assigned Case No. 05-86866-BJH-7 (the

---

[1] The Debtors concede that the amounts owed for 2002 are excepted from discharge, and the IRS concedes that penalties and interest on such penalties for tax years 1998-2001 are dischargeable under 11 U.S.C. § 523(a)(7), since they were imposed with respect to transactions or events that occurred more than three years before the filing of the petition. *McKay v. U.S.*, 957 F.2d 689 (9th Cir. 1992); *Roberts v. IRS (In re Roberts)*, 906 F.2d 1440 (10th Cir. 1990); *Hopkins v. IRS (In re Hopkins)*, 131 B.R. 308 (Bankr. N.D. Tex. 1991). At the time of trial, the IRS provided the Court with a calculation of the actual amount of taxes and interest that it contends is excepted from discharge for the tax years 1998 through 2001, calculated through February 7, 2008 (the commencement of trial). That amount is $656,376.21. *See* Gov't Ex. 23, 24 and 24B. The Debtors do not dispute this calculation.

Despite the discharge of the penalties and interest on such penalties for the tax years 1998-2001, the IRS continues to hold federal tax liens for the Mixons' income tax obligations for tax years 1998-2001 that secure payment of these discharged sums, in addition to securing the principal tax and interest obligations.

"Case"). The Debtors filed the Case as a "no-asset" bankruptcy case. On June 28, 2006, the Court entered an order discharging the Debtors under Chapter 7. *See* Docket No. 34 in Case No. 05-86866-BJH-7. On September 4, 2007, the IRS filed this adversary complaint against the Debtors.

The Debtors have resided since 1998 at 5612 Estate Lane, Plano, Collin County, Texas 75094 ("Mixon Residence"). The Mixon Residence is located approximately one mile from the Pecan Hollow Golf Course and includes nearly 5,000 square feet of living space, sits on approximately 3.7 acres of land, has a four-car garage and a swimming pool.[2] According to the Collin County Appraisal District, as of the Petition Date (November 17, 2005), the tax-assessed value of the Mixon Residence was $537,000. The Mixons' monthly mortgage payment, including taxes and insurance, is over $4,400. The Debtors have two children. Mrs. Mixon has not worked outside the home since the Debtors were married in 1990.

## A. Debtors' Income Tax History

### i. Amounts Owed

As of the Petition Date, the Debtors owed federal income tax, penalties, and interest for tax years 1998-2001 in the amount of $691,465.43. *See* Gov't Ex. 24. The IRS concedes that penalties and interest on such penalties are dischargeable. Therefore, the amount which the IRS contends is

---

[2] The IRS points out that in their dealings with the IRS and the bankruptcy court, the Mixons listed their address as 5612 Estate Lane, Parker, Texas, but the Mixon Residence is actually at 5612 Estate Lane in Plano, Texas. The IRS asks the Court to infer that the Mixons characterized the Mixon Residence as being located in Parker, because it is largely rural and not nearly as affluent as Plano, in order to mislead their creditors. The Court is not persuaded that the Mixons' motivation was deceit. The note and deed of trust given by the Mixons to their mortgagee both identify the Mixon Residence as being located in Parker, Texas. The legal description of the property contained in the deed of trust describes the property as "Lot 15, of Dublin Road Estates, Phase II, an Addition to the City of Parker, Collin County, Texas," with an address of 5612 Estate Lane, Parker, Texas." Defs' Ex. 1. However, Parker, Texas does not have a United States Post Office, so the Mixons' mailing address is in Plano, Texas. Audiotape: hearing held 2/8/08 at 2:49:39 - 2:49-50:36 (on file with the Court); Defs' Ex. 65.

non-dischargeable, as of February 7, 2008 (the first day of trial in this case), totaled $656,376.21 for tax years 1998-2001 (hereinafter, the "tax years at issue"), including accrued statutory interest through the date of trial. *Id*.

### ii. Payment History

During the tax years at issue (1998 - 2001), Kevin Mixon owned and operated Colour Quest, Inc., a subchapter-S corporation and successful business which sold and brokered printing jobs, largely for retail sales catalogs. Kevin Mixon was self-employed for income tax purposes, and thus was required to make estimated tax payments, since Colour Quest, Inc. did not withhold taxes from his pay. During the tax years at issue, the Debtors reported their adjusted gross income ("AGI") to the IRS as totaling nearly $1.6 million, as follows:

1998 AGI:     $472,615
1999 AGI:     $393,301
2000 AGI:     $339,925
2001 AGI:     $393,559

*See* Gov't Ex. 23.[3]

In 1998, despite having an AGI of $472,615, the Mixons did not pay either withholding or estimated taxes during the year.[4] After seeking and receiving two extensions of time to file tax returns, the Mixons filed a 1998 tax return on October 18, 1999. Across the front of the return was the notation "Preliminary Return - Final Will be Filed with 1040-X within 60 Days." Gov't Ex. 3A.

_____

[3] For the 1998 tax year, the Debtors filed a "preliminary" return showing an AGI of $151,918. In March of 2000, the Debtors filed an amended return showing an AGI of $472,615. For the 1999 tax year, the Debtors filed a "preliminary" return showing an AGI of $341,312. In December of 2000, the Debtors filed an amended return showing an AGI of $393,301. For the 2000 tax year, the Debtors filed a return showing an AGI of $495,152. In January of 2002, the Debtors filed an amended return showing an AGI of $339,925. For the 2001 tax year, the Debtors filed a return showing an AGI of $393,559; the Debtors did not subsequently amend this return. The Court has used the amended returns, where applicable, to calculate the Debtors' AGI during the tax years at issue.

[4] The record shows that $15.00 of federal income tax was withheld from Mixon's pay in 1998.

The return showed an AGI of $151,918 and a tax owed of $41,211.  The 1998 "preliminary" return also showed a penalty owed of $1,789 for failure to pay estimated taxes.  The Mixons did not make any payments towards either the tax or the penalty owed when they filed this "preliminary" return.  Accordingly, the IRS assessed both interest and an additional penalty for failure to pay the tax liability.  On March 3, 2000, nearly three months after the Mixons indicated they would file an amended return and nearly a year after their return was originally due, the Mixons filed an amended return for the tax year 1998.  Gov't Ex. 3B.  The amended return showed an AGI of just over $320,000 more than the Mixons initially reported on their 1998 original return.  The amended return showed a total tax liability of $171,078.  The Mixons paid their 1998 taxes on March 3, 2000, but did not make any payments towards the penalties or interest owed as a result of their failure to make estimated tax payments and their failure to pay their taxes when due.  Those sums remain unpaid to date.

In 1999, despite having an AGI of $393,301, the Mixons  did not pay either withholding or estimated taxes during the year.  After seeking and obtaining two extensions of time within which to file their return, the Mixons filed their 1999 tax return on October 17, 2000.  Across the front of the return was the notation "Preliminary Return - Final Will be Filed with 1040-X within 60 Days."  The Mixons made no tax payments with this "preliminary" return, although the return showed that taxes of $123,845 were due.  Accordingly, the IRS assessed penalties for failure to pay estimated taxes and failure to timely pay taxes with the return, plus interest.[5]  On December 12, 2000, the Mixons filed their amended return for tax year 1999, which showed a total tax liability of $132,646.

---

[5] The record shows that a total of $74.00 was withheld from Mixon's pay in 1999.

The Mixons have never paid that amount, nor have they made any payments towards penalties or interest.

In 2000, despite having an AGI of $339,025, the Mixons did not pay either withholding or estimated taxes during the year.[6] After seeking and obtaining two extensions of time within which to file their return, the Mixons filed their 2000 tax return on October 18, 2001. The Mixons made no tax payments with their return, although the return showed that $154,796 was due. Gov't Ex. 3E. Accordingly, the IRS assessed penalties for failure to pay estimated taxes and failure to timely pay taxes with the return, plus interest. Gov't Ex. 23. On January 4, 2002, the Mixons filed an amended return for the tax year 2000, which amended their AGI, and therefore their tax liability, downward. The amended return showed that a tax of $109,708 was due. Gov't Ex. 3G. The Mixons have never made any payments toward this amount or towards penalties or interest for the tax year 2000.

In 2001, despite having an AGI of $393,559, the Mixons did not pay either withholding or estimated taxes during the year.[7] After seeking and obtaining an extension of time within which to file their return, the Mixons filed their 2001 tax return on May 25, 2002. The Mixons made no tax payments with their return, although the return showed that $129,718 was due. Gov't Ex. 3F. Accordingly, the IRS assessed penalties for failure to pay estimated taxes and failure to timely pay taxes with the return, plus interest. Gov't Ex. 23. The Mixons have never made any payments toward either their tax obligation or towards penalties or interest for the tax year 2001.

Although the dischargeability of taxes owed for the tax years 2002 and later is not at issue in this adversary proceeding, the Court notes that the Mixons made $7,000 in estimated tax payments

---

[6] The record shows that only $43.00 was withheld from Mixon's pay in 2000.

[7] The record shows that only $12.00 was withheld from Mixon's pay in 2001.

in 2002 (towards a 2002 tax liability of over $31,000). Gov't Ex. 23. The Mixons late-filed their income tax returns for the years 2002, 2003, 2004, 2005 and 2006 (the 2005 and 2006 returns were not filed until January 30, 2008). Moreover, until January 30, 2008,[8] shortly before trial, the Mixons had not made a voluntary federal income tax payment since tax year 2002, when they paid the $7,000 in estimated tax payments. In fact, in the ten-year period between January 1, 1998 and January 30, 2008, the Debtors made voluntary income tax payments on only two of the tax years – 1998 and 2002.

At all relevant times, the Mixons have been aware of the duty to file tax returns and the deadlines for doing so, and they were aware that they were required to pay the full amount of taxes reported as due on the tax return at the time of filing. The Mixons became aware of IRS enforcement and collection activities no later than June of 2001, when an IRS revenue officer visited their home. Gov't Ex. 15. The revenue officer warned the Mixons of potential IRS enforcement actions, including levies, seizures, and the filing of tax liens. *Id*. On July 13, 2001, the Mixons notified the IRS that Enrolled Agent Robert Wilson was their power of attorney and representative with respect to tax matters pertaining to their 1998, 1999, 2000 and 2001 federal income taxes. Gov't Ex. 26.

### iii. Federal Tax Liens

On August 21, 2001, the IRS filed notices of federal tax lien against the Mixons in the Collin County real and personal property records, for their unpaid 1998 and 1999 federal income tax. On

---

[8] On January 30, 2008, the Mixons paid $15,838 to the IRS – *i.e.*, a $7,525 payment on their 2004 federal income tax, a $4,472 payment on their 2005 federal income tax, and a $3,841 payment on their 2006 federal income tax. Audiotape: hearing held 2/7/08 at 3:06:10-3:09:25 (on file with the Court). Although the deadline for the filing of 2007 tax returns had not yet run as of the date of trial, the Court notes that the Mixons failed to make any estimated tax payments during 2007. *Id*. at 3:10:30-3:10:35 (on file with the Court).

April 3, 2002, the IRS filed a notice of federal tax lien against the Mixons in the Collin County real property records, for their unpaid 2000 federal income tax. On March 12, 2003, the IRS filed a notice of federal tax lien against the Mixons in the Collin County real property records, for their unpaid 2001 federal income tax.

iv. The Mixons' Offer-in-Compromise and Financial Statements

On June 3, 2002, the Mixons gave the IRS a $165,000 offer in compromise ("OIC") to settle their 1998, 1999, 2000, and 2001 federal income tax debt that then totaled in excess of $500,000 on the basis of "Doubt as to Collectability. '[I have insufficient assets and income to pay the full amount'." Gov't Ex. 11. The Mixons offered to pay $75,000 within ninety days followed by $1,100 per month for 84 months. *Id*. In support of the OIC, the Mixons gave the IRS an IRS Form 433-A Collection Information Statement for Wage Earners and Self-Employed Individuals ("Form 433-A"), signed under penalty of perjury. Gov't Ex. 10. That Form 433-A contained information about the Mixons' income, assets and liabilities.

About a month and a half later, Kevin Mixon gave Pavillion Bank a personal financial statement in connection with a loan application to purchase a vehicle, which contained information about the Mixons' income, assets and liabilities (the "Pavillion Statement"). Gov't Ex. 12. The Pavillion Statement differed materially from the Form 433-A given to the IRS only a month and a half earlier. For example, the Form 433-A stated that the Mixons had cash totaling $310. The Pavillion Statement stated that the Mixons had $12,000 in cash. The Form 433-A stated that the Mixons owned 8 cars, a boat, a RV and a trailer, worth in the aggregate $358,600 and encumbered by liens totaling $398,784. The Pavillion Statement stated that the Mixons owned 16 cars, a boat, a RV and 4 trailers, worth in the aggregate $860,800, and encumbered by liens totaling $399,916. The

Mixons' Form 433-A disclosed a total net worth of $52,921, while the Pavillion Statement disclosed

a net worth of over $1 million.[9]  It is clear that the Mixons were lying to either the IRS or to Pavillion

Bank on their financial statements.[10]  Thereafter, the Mixons continued to paint differing pictures of

their financial condition to the IRS, to Pavillion Bank, and to this Court.[11]

The IRS rejected the OIC on the basis that it believed that the Mixons had sufficient assets

and income to pay their tax debt in full.  Def. Ex. 22 ("The amount offered is less than your

---

[9] The Mixons' Pavillion Statement also claimed ownership of many assets that were not disclosed at all to the IRS on Form 433-A.

[10] The IRS asks the Court to find that the Mixons' Form 433-A was false.  While it is clear that either the Form 433-A or the Pavillion Statement was  false, the IRS did not introduce sufficient evidence for the Court to make a finding as to which of the Mixons' financial statements was false.

[11] On March 29, 2004, Kevin Mixon submitted a financial statement to Pavillion Bank (the "March 2004 Pavillion Statement").  Seven months later, on October 4, 2004, he gave the IRS another Form 433-A (the "October 433-A") signed under penalty of perjury.  The information in the October 433-A differs materially from the information included in the March 2004 Pavillion Statement.  For example, in the March 2004 Pavillion Statement, Kevin Mixon stated that he had assets worth $1,340,000 and liabilities of $550,000, for a net worth of $790,000.  In the October 433-A, Kevin Mixon disclosed assets worth $514,120 and liabilities of $464,180, for a net worth of $49,940.  The Court does not believe that the Mixons' net worth dropped by nearly $750,000 in seven months.  In addition, the October 433-A listed the value of the Mixon Residence at $450,000, with a $376,180 loan balance, or equity of $73,820.  In the March 2004 Pavillion Statement, Kevin Mixon stated that the value of his real estate was $750,000, and that the mortgage debt was $360,000, with equity of $390,000.  Once again, the Court finds that either the March 2004 Pavillion Statement or the October 433-A was false, but is unable to conclude which one is false.

On March 3, 2005, the Mixons gave the IRS another Form 433-A, dated February 26, 2005 (the "February 2005 Form 433-A"), signed under penalty of perjury.  The information in the February 2005 Form 433-A is materially inconsistent with the financial information included in the Mixons' November 17, 2005 bankruptcy schedules.  In the February 2005 Form 433-A, Kevin Mixon disclosed assets worth $514,120 and liabilities of $464,180, for a net worth of $49,940.  Also in the February 2005 Form 433-A, Kevin Mixon stated that the value of his real estate was $450,000, with a $376,180 loan balance, or equity of $73,820.  The Mixons did not disclose their interest in or the value of an additional 1.1 acre they had purchased in 2002.  *See infra*, p. 10.  In the bankruptcy schedules, the Mixons disclosed assets with a value of $690,310.57, liabilities of $1,622,081.61, or a negative net worth of nearly $1 million.  In the bankruptcy schedules, the Mixons stated that the value of their real estate (including the 1.1 acre, which was disclosed in their schedules) was $574,000.  As it is extremely unlikely that the value of their real estate increased from $450,000 to $574,000 in the span of nine months, the Court finds that either the February 2005 Form 433-A or the bankruptcy schedules were false.  In this instance, the Court notes that Collin County appraisal district records for the year 2005 value the Mixon Residence and the 1.1 acre lot at an aggregate sum of $607,080.  The Court thus finds that the February 2005 Form 433-A was materially false.

reasonable collection potential . . . [b]ased on the financial information you submitted, we have determined you can pay the amount due in full").[12]

After federal tax liens were filed against them and approximately one month after the Mixons gave the OIC to the IRS on the basis of their inability to pay their taxes, the Mixons purchased from one of their neighbors (James Bartoszewicz, who financed the purchase)[13] an additional parcel of undeveloped real property (1.168 acres), contiguous to the Mixon Residence. Although the Debtors did not make a cash down payment for this additional acre, the terms of the loan obligate the Mixons to make monthly payments of $279.00. According to the Collin County Appraisal District, as of the Petition Date, this adjoining acreage had a tax-assessed value of $70,000. The Debtors' bankruptcy schedules value this additional acre at $37,000. The additional acre was not disclosed to the IRS on any of the Forms 433-A submitted to the IRS after its purchase.

## II.    Applicable Law

A Chapter 7 debtor will be denied a discharge of "any debt . . . for a tax . . . with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). The purpose of the Section 523 exception to discharge is to limit the Bankruptcy Code's discharge of tax debts to the "honest but unfortunate" debtor. *Grogan v. Garner*, 498 U.S. 279, 287 (1991); *In re Hickman*, 260 F.3d 400, 407 (5th Cir. 2001). The IRS bears the burden of proof with respect to its claim under Section 523(a)(1)(C). The relevant evidentiary

---

[12] The IRS argues that the Mixons undervalued their assets on the OIC. The Mixons and Robert Wilson testified that the asset values used on their Form 433-A were "liquidation values," which the IRS permits them to use. However, the Mixons were not able to point to any statute, regulation or IRS manual which provides for the use of liquidation values.

[13] The special warranty deed memorializing the purchase was recorded on July 5, 2002.

standard is a preponderance of the evidence, *Grogan*, 498 U.S. at 284-286, which requires the IRS to establish that the existence of a fact is more probable than its nonexistence. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993).

The legal standards to be applied under Section 523 are undisputed by the parties. Courts have construed the language "attempted in any manner to evade or defeat [a] tax" as used in Section 523(a)(1)(C) broadly, in light of the fact that "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define them lest its effort to do so result in some unexpected limitation." *Dalton v. IRS*, 77 F.3d 1297, 1301 (10th Cir. 1996) (*quoting Spies v. United States*, 317 U.S. 492, 499 (1943)). It is well-settled that the statute applies both to attempts to defeat the assessment of a tax and to attempts to defeat the payment or collection of a tax. *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994); *United States v. Merrill*, 336 B.R. 804, 808 (D. Or. 2005); *Smith v. U.S.*, 202 B.R. 277, 279 (S.D. Ind. 1996)*; see also In re Griffith*, 206 F.3d 1389, 1392-1396 (11th Cir. 2000) (en banc).

Section 523(a)(1)(C) contains both a conduct element (*i.e.*, that the debtor sought to evade or defeat a tax liability) and a mental state element (*i.e.*, that he did so willfully). *See In re Toti*, 24 F.3d at 809. The conduct element can be satisfied by acts of commission or by acts of culpable omission. *In re Jacobs*, 490 F.3d 913, 925-27 (11th Cir. 2007) (holding that debtor's chronic late-filing of tax returns, his non-payment of the liabilities reported in those returns, his use of nominees to hold title to his personal residence and vehicles, his payments of luxury expenses such as golf memberships, among other things, supported the conduct element under § 523(a)(1)(C)); *In re Bruner*, 55 F.3d 195, 200 (5th Cir. 1995) (stating in *dictum* that "Section 523(a)(1)(C) surely encompasses both acts of commission as well as culpable omissions" and excepting from discharge

a debtor's unpaid taxes where there was a pattern of non-payment accompanied by a pattern of failure to file returns and conduct aimed at concealing income); *In re Swenson*, 381 B.R. 272 (Bankr. E.D. Cal. 2008) (holding that non-payment of tax liabilities, non-payment of estimated taxes, chronic late-filing of returns, under-reporting of income, overstatement of labor costs, heavy use of cash and luxury spending, and use of nominees to hold assets supported the conduct element under Section 523(a)(1)(C)); *In re Hamm*, 356 B.R. 263, 280-83 (Bankr. S.D. Fla. 2006) (holding that debtors' use of nominees to hold title to property for their benefit, extensive dealing in cash, and wrongful deductions of expenses on federal tax returns constituted affirmative acts of tax evasion for purposes of Section 523(a)(1)(C)); *In re Hamer*, 328 B.R. 825, 834 (Bankr. N.D. Ala. 2005) (holding the conduct element satisfied where debtor earned income during the tax years at issue but did not make any estimated tax payments, had inadequate or no withholdings, and late-filed his tax returns); *In re Peterson*, 317 B.R. 556, 563 (Bankr. N.D. Ga. 2004) (holding the conduct element satisfied, in part, where debtor maintained substantial income during the tax years at issue, but "managed to avoid collecting any assets that could be subject to levy by the IRS for his delinquent taxes" by 'leasing' cars and 'renting' housing from a third party companion); *In re Colish*, 289 B.R. 523 (Bankr. E.D.N.Y. 2002).

Thus, courts consider the "totality of the circumstances" in determining whether Section 523(a)(1)(C) should prevent the discharge of debtor's tax debts. *In re Swenson*, 381 B.R. 272 (Bankr. E.D. Cal. 2008); *In re Spiwak*, 285 B.R. 744, 750 (S.D. Fla. 2002). In considering the totality of the circumstances, courts have looked to several different factors as indicia of attempts to evade or defeat tax obligations. Such indicia include conduct such as (i) understatement of income for more than one year; (ii) implausible or inconsistent behavior; (iii) extensive dealings in cash; (iv)

failure to cooperate with the IRS; (v) inadequate record keeping; (vi) transfer[s] of assets to a family member; (vii) transfer[s] of assets for inadequate consideration; (viii) transfer[s] that greatly reduce assets subject to IRS execution; (ix) transfers made in the face of serious financial difficulties; (x) failure to acquire significant assets relative to a debtor's earnings; and (xi) any other conduct that is likely to mislead or conceal. *In re Hamm*, 356 B.R. 263, 276 (Bankr. S.D. Fla. 2006). A court may also consider a debtor's lavish lifestyle while concurrently failing to pay taxes, *id*., or the fact that a debtor has placed assets in the names of others. *In re Gardner*, 360 F.3d 551, 557 (6th Cir. 2004); *In re Volpe*, 377 B.R. 579 (Bankr. N.D. Ohio 2007).

The parties agree that the test for willfulness in the case of a debtor who is financially able to pay taxes but chooses not to do so is whether the debtor (i) had a duty under the law, (ii) knew of the duty, and (iii) voluntarily and intentionally violated that duty. *In re Bruner*, 55 F.3d 195 (5th Cir. 1995); *In re Toti*, 24 F.3d 806 (6th Cir. 1994); *U.S. v. Harrison*, No. H-05-3507, 2006 WL 3245743 (S.D. Tex. Nov. 7, 2006). Fraudulent intent is not required in order to prove the mental state requirement of Section 523(a)(1)(C). *In re Fegeley*, 118 F.3d 979, 984 (3rd Cir. 1997); *see also In re Jacobs*, 490 F.3d at 924 (state that the standard is "knowledge and deliberateness," as opposed to inadvertence); *In re Volpe*, 377 B.R. 579 (Bankr. N.D. Ohio 2007); *In re Hassan*, 301 B.R. 614 (S.D. Fla. 2003). Whether a debtor acted "willfully" for purposes of Section 523(a)(1)(C) is a question of fact which must be determined in light of the totality of circumstances of the case, including all inferences to be drawn about debtor's state of mind based on his or her conduct. *In re Spiwak*, 285 B.R. at 750-51 (stating that circumstantial evidence of willfulness traditionally includes "(1) the recurrence of the understatement of income for more than one tax year, (2) the understatement of income, (3) implausible or inconsistent explanations of behavior, (4) inadequate records, (5)

transfer[s] of assets to a family member, (6) transfers for inadequate consideration, (7) transfer[s] that greatly reduced assets subject to IRS execution, and (8) transfers made in the face of serious financial difficulties"); *see also In re Klayman*, 333 B.R. 695, 704 (Bankr. E.D. Pa. 2005).

Nonpayment of taxes, taken alone, is insufficient to prove a willful attempt to evade or defeat taxes. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996); *In re Myers*, 216 B.R. 402 (6th Cir. BAP 1998), *aff'd* 196 F.3d 622 (6th Cir. 1999). However, the debtor's failure to pay a known tax is relevant evidence which the bankruptcy court should consider to determine whether the debtor willfully attempted to evade or defeat taxes. *Myers*, 216 B.R. at 405. Further, culpability may be established by circumstantial evidence, *In re Volpe*, 377 B.R. 579 (Bankr. N.D. Ohio 2007), including the debtor's conduct over a period of time which may extend beyond the time when the tax payment was due. *In re Birkenstock*, 87 F.3d at 951; *In re Lacheen*, 365 B.R. 475, 483-84 (Bankr. E.D. Pa. 2007); *In re Colish*, 289 B.R. 523 (Bankr. E.D.N.Y. 2002) (court can consider evidence outside the tax years in question if it is sufficiently related in time and character to be probative). Moreover, the debtor may not establish the absence of the required intent by presenting evidence of offers in compromise filed with the IRS long after the debtor learned of the tax liability. *In re Klayman*, 333 B.R. at 704. In the context of an unfiled tax return, the United States Court of Appeals for the Ninth Circuit has upheld the exception of debtor's tax liabilities from discharge where it found that debtors' cooperation with the IRS to resolve those debts was a "belated acceptance of responsibility" and "not an honest and reasonable attempt to comply with the requirements of the tax law." *In re Hatton*, 220 F.3d 1057, 1061 (9th Cir. 2000).

III. **Legal Analysis**

A. **Conduct Element**

Here, the Mixons engaged in conduct that supports a finding that they willfully evaded payment of the taxes at issue.[14] This is so for several reasons.

First, the Mixons completely failed to pay any of their federal income tax liabilities for 1999, 2000 and 2001, despite earning AGI in excess of $1.1 million during this period. In addition, the Mixons failed to make estimated tax payments for 1998, 1999, 2000 and 2001. As noted by the court in *In re Lacheen*, 365 B.R. 475, 484 (Bankr. E.D. Pa. 2007):

> Another such factor is the [d]ebtor's manipulation of the voluntary tax system by failing to make estimated payments toward anticipated tax liabilities and failing to pay taxes due when concurrently seeking the automatic filing extension. As noted by the court in *In re Ripley*, 926 F.2d 440 (5th Cir. 1991): 'the government relies primarily upon employers to collect income and Social Security taxes from their employees. Employers collect these taxes through the customary withholding mechanism. However, in the case of a self-employed individual . . . withholding is inapposite. Such persons must use the estimated tax procedure, which simulates withholding by requiring taxpayers to remit payments to the IRS throughout the year.' The purpose of these alternative "escrowing" procedures is to ensure that taxpayers will not exhaust their income before the tax thereon becomes due. Courts have found that the failure to make voluntary payments toward tax liabilities by submitting to employer withholding tax procedures is evidence of an intention not to pay taxes . . . a self-assessed taxpayer who simply does not pay or underpays based on his assessment of what he can afford is no less culpable . . . when the failure to pay the withholding or estimated tax is combined with an improper use of the filing extension procedure, evidence of intended tax avoidance is stronger.

---

[14] The IRS produced quite a bit of evidence, which the Court has reviewed. The Court will not, however, conduct an exhaustive review of each instance of potential tax evasion in this Memorandum Opinion. Rather, the Court will only highlight the evidence that the Court finds dispositive. The Court simply notes that there is other evidence in the record with which the Court could support its finding of willful tax evasion.

*Lacheen*, at 484-85 (internal citations omitted).[15]  Moreover, the Mixons late-filed their tax returns for every tax year since 2002.

Second, when the Mixons submitted the OIC, they owned at least 7 vehicles, a RV, a trailer and a boat, on which they were obligated to make monthly payments of over $9,000,  and yet they offered to pay the IRS just $1,100 per month.  The Mixons claimed that 4 of the cars (including a Mercedes and a Porsche), the trailer, the RV and the boat were all "business expenses" of Colour Quest, Inc. and thus "are not a part of the 433-A."  Gov't Ex. 10.  However, all of the vehicles except the trailer were titled in Kevin Mixon's name.

Third, since the mid-1990s, Kevin Mixon has been using a credit card in the name of his father's company, David Mixon & Associates.  David Mixon permitted his son, Kevin, to use the card as long as Kevin paid the bills he incurred, and so long as Kevin paid his "share" of the American Express bill directly to American Express.  This arrangement permitted Kevin Mixon to hide income from the IRS.  For example, in 2002, when the Mixons submitted the OIC claiming that they had $10,000 per month in income[16] and $11,737 in monthly expenses,[17] such that they were

---

[15] As the *Lacheen* court further noted, an application for an extension of time to file a tax return must be filed on or before the due date for the return, and it must show the full amount properly estimated as tax and must be accompanied by the full remittance of the amount properly estimated as tax which is unpaid as of the date prescribed for filing the return.  The record in this case shows that the Mixons frequently sought and obtained extensions of time to file their returns, but did not remit any payments with those applications for extensions of time.

[16] The IRS case history notes for the Mixons' file indicate that on June 4, 2002, Robert Wilson (the Mixons' power of attorney) brought the OIC to the IRS, and that the revenue officer noted "the only income claimed was "other" for $10,0000 and there was nothing to show where this money is coming from.  POA said it is an estimate based on what TPS are spending."  Gov't Ex. 15.  Three days later, the history notes indicate that Mr. Wilson faxed "an addendum stating the $10,000 Other Income is the average that TP gets from the S Corp."  *Id*.

[17] The monthly living expenses on the OIC were as follows: "Food, Clothing and Misc." - $2,000; "Housing and Utilities" - $3,421; "Transportation" - $1,854; "Health Care" - $962; "Taxes - Income and FICA" - $3,000 (of note, the Mixons only made $7,000 in estimated tax payments for the tax year 2002; not the $36,000 suggested by their monthly expense list); and "Life Insurance" - $500.

unable to pay their income tax debt in full, the record shows that Kevin Mixon incurred *and paid* over $87,000 towards the American Express bill in his father's name, which constituted an expense over and above their monthly living expenses. Gov't Ex. 49C. Of note, also during 2002, the IRS levied on the Mixons' bank accounts and collected less than $100. Gov't Ex. 23. Similarly, Kevin Mixon incurred charges and paid to American Express over $140,000 in 2001, and incurred charges and paid nearly $70,000 to American Express in 2003 – all for expenses over and above the monthly living expenses disclosed to the IRS on the OIC.

Kevin Mixon was also incurring and paying substantial American Express charges during the six months preceding the filing of the Case – despite his testimony at his Section 341 meeting that he had no income. Between April of 2005 and December of 2005, Kevin Mixon incurred monthly charges on his father's credit card in the approximate amount of $20,000 and paid them on a current basis. During this time period, the IRS collected nothing on the debt owed for the tax years at issue.

As noted earlier, the Mixons paid no income taxes for 2004, 2005, 2006 or 2007 until they made some payments in January of 2008, right before trial. Yet, between April of 2004 and January of 2008, Kevin Mixon incurred charges on his father's American Express card of over $200,000 and paid those charges on a current basis. During this time period, the IRS was able to collect absolutely nothing on the taxes due for tax years 1998 through 2001.

The compelling and inescapable inference from this evidence is that Kevin Mixon was incurring charges on his father's credit card in order to hide income from the IRS and thwart its collection efforts.

Fourth, and similarly, the Mixons have used Colour Quest's bank account to pay their personal expenses, and the compelling and inescapable inference from this evidence is that they were

doing so to hide income and/or assets from the IRS and thwart its collection efforts.[18]  For example,

the record shows that in 2003, Colour Quest, Inc. had gross sales of over $485,000.  Gov't Ex. 61.

Kevin Mixon was the only officer of Colour Quest, and the corporate tax return shows that the

corporation paid only $10,000 to Kevin Mixon as compensation.  *Id*.  Kevin Mixon conceded,

however, that the family's personal expenses were being paid by Colour Quest that year, Audiotape:

hearing held 2/7/08 at 2:52:50 - 2:54:15 (on file with the Court), and that "from time to time" personal

bills were paid from the Colour Quest account.  Audiotape: hearing held 2/8/08 at12:10:07-12:10:44;

12:33:10-12:34:12 (on file with the Court).  Jamie Mixon wrote many of the checks from the Colour

Quest account, and she did so when Kevin Mixon told her there was money in the account.

Audiotape: hearing held 3/17/07 at 12:42:44-12:43:02 (on file with the Court).[19]

Despite the fact that the Mixons paid personal expenses out of the Colour Quest account, that

account was not disclosed to the IRS on the OIC.  On the exact date that the Mixons signed the OIC,

Colour Quest had over $247,000 in its checking account, which was being used, in part, as noted

above, to pay the Mixons' personal expenses. In fact, the bank statement for the Colour Quest, Inc.

account for the period of May 31, 2002 through June 28, 2002 (Gov't Ex. 12A) shows that on June

19, 2002, a check in the amount of $10,838.04 cleared the Colour Quest, Inc. account.  The American

Express account statement for David Mixon & Associates shows that on June 15, 2002, a payment

in that exact amount was posted to the account.  Gov't Ex. 49C, pp. 135.  The month before, charges

---

[18] The IRS's history notes for the Mixons' file indicates that a representative of Pavillion Bank told the IRS on August 5, 2004 that the monthly payments of $1,466.14 for a Porsche titled in Kevin Mixon's name was being withdrawn from a Colour Quest checking account.  The Mixons' power of attorney told the IRS on September 9, 2004 that Kevin Mixon "is paying all his personal expenses from the corporation."

[19] Jamie Mixon testified that she had possession of the Color Quest check register and wrote the checks, but she never knew the balance in the account.

incurred on the American Express account using the card in Kevin Mixon's name totaled $11,908.25, including charges for 24 Hour Fitness, dry cleaning services, an airline ticket to Cabo San Lucas, Mexico with related rental car and meal charges, a payment for a Royal Holiday Club timeshare, movie theater tickets, Netflix, and Funcoland Store charges. *Id*. at pp. 128-134. These charges were incurred *and paid* the month that the Mixons swore under penalty of perjury to the IRS that their income was $10,000 per month and they were unable to pay anything more than $1,100 per month towards their half million dollar tax liability. *See Jacobs v. United States*, 490 F.3d 913 (11th Cir. 2007) (conduct element of Section 523(a)(1)(C) satisfied where debtor had large discretionary expenditures when he knew of tax liabilities, was capable of meeting them, but did not).

The Mixons' pattern of using corporate accounts to pay personal expenses continues to date, and the Court finds that the Mixons are using these accounts to avoid collection efforts by the IRS. Mixon testified that he formed Lone Star Graphic Arts Group, Inc. ("Lone Star") in 2006, after the filing of his bankruptcy petition, because

> we were trying to get on the right path. We had not managed Colour Quest, Inc. as well as it could have been, and we were trying to make our fresh start and we wanted to start with a fresh corporation, handle our bills correctly, handle our business financing and payments the right way. I wasn't aware that you couldn't use your accounts freely, and I learned that, and that's why in 2006 I started Lone Star so I could use it exclusively to pay business transactions that were related to business.

Audiotape: hearing held 2/8/08 at 2:05:42-2:06:30 (on file with the Court). He further testified that he has not used Lone Star's checking account to pay personal expenses. Audiotape: hearing held 2/8/08 at 12:33:25-12:33:56 (on file with the Court).

Based on other evidence introduced at the hearing, the Court finds this oral testimony to be false and Kevin Mixon to lack credibility. For example, the documentary evidence shows that on

May 24, 2006, Jamie Mixon (who testified that she writes checks to whoever Kevin tells her to write them to) completed and signed a check drawn on the Lone Star account at Pavillion Bank, payable to American Express. Gov't Ex. 4, pp. 11, 12. The check is in the amount of $2,498.42, and the notation on the check is that it is for a payment on American Express account no. 378265188984168. *Id*. That account number corresponds to Kevin Mixon's card number on his father's corporate card, which David Mixon testified that he lets his son use, as noted previously. On May 26, 2006, two days after Jamie Mixon wrote the check on the Lone Star account, a payment in its exact amount posted to the American Express account statement for David Mixon's corporate account. *See* Gov't Ex. 49C, p. 321. Charges incurred the month before using the credit card with Kevin Mixon's name on it total about $2,600, and include some clearly personal expenses. For example, there were charges by LA Fitness Corp. ($32.46), Plano Eye Associates for eye exams/eye wear/acc ($162.00); the Royal Holiday Club timeshare with the Mixons testified they own (but failed to disclose on their bankruptcy schedules ($166.52); and Netflix ($19.47). Similarly, on July 23, 2007, Jamie Mixon wrote a check on the Lone Star checking account, payable to American Express, for $7,329.15. A payment in that precise amount appears on David Mixon's American Express corporate credit card statement. The American Express statement for the month before, which shows charges incurred using the credit card with Kevin Mixon's name on it, includes charges for a movie theater, Game Stop, LA Fitness, iTunes, Dallas Turf and Golf Club ($1,097.80), a plane ticket in the Mixon's daughter's name for a trip to Grand Cayman, and Netflix. The Court also notes that Kevin Mixon testified that in June, 2007 (the month he incurred the charge to Dallas Turf and Golf Club), he paid about $1,000 to rebuild a golf cart he uses at the Mixon Residence.

The Court finds that throughout the tax years at issue and after they filed their 2005 bankruptcy, the Mixons have used and/or owned bank accounts in the names of closely-held corporations that they owned; namely, Colour Quest, Colour Quest Automotive dba North Dallas Auto Center, and Lone Star. They have used these accounts to pay their personal expenses and to defeat IRS collection of their back taxes. This constitutes a willful attempt to evade or defeat their taxes, because they used these corporate accounts to prevent the IRS from levying on the accounts and collecting their income tax debts. *In re Griffith*, 206 F.3d 1389 (11th Cir. 2000) (noting that the debtor had engaged in "personal-corporate commingling of funds" which evidenced intent to evade tax liability); *In re Hamm*, 356 B.R. 263, 281 (Bankr. S.D. Fla. 2006) (noting that by using a business account to pay personal expenses, the debtors "managed to protect personal assets in a place safe from levy by the Internal Revenue Service . . . the debtors used the business account . . . as a kind of personal piggy bank upon which the Internal Revenue Service could not easily levy").

The IRS also argues that the Mixons failed to disclose certain assets in their bankruptcy schedules, which constitutes conduct evidencing their willful attempts to evade their 1998, 1999, 2000 and 2001 taxes. Specifically, the IRS proved that the Mixons failed to list their ownership of a 1986 Honda  Motorcycle, a vacation club timeshare, and a golf cart.[20] The Court does not find these

---

[20] The IRS contends that the Mixons also failed to disclose an ownership interest in a 1996 Mercedes Benz. Kevin Mixon's father, David Mixon, lent Kevin $20,000 in 2004, and Kevin Mixon signed over the title to the Mercedes to his father as collateral for the loan. Kevin did not repay the loan, and David Mixon "repossessed" the car. The Mercedes is therefore titled in David Mixon's name. David Mixon testified that after he took possession of the car, the car sat idle at his home in Driftwood, Texas. In 2006, Kevin needed a car, and David Mixon let his son bring the car back to Dallas. The Court finds David Mixon's testimony credible, and the Court is not persuaded that Kevin Mixon failed to disclose an ownership interest in the Mercedes. The Court notes, however, that this "repossession" by David Mixon should have been, but was not, disclosed in response to Question 10 on the Debtors' statement of financial affairs. Similarly, the Mixons failed to disclose on the SOFA a transfer of a 1999 Corvette to a racing friend, Michael Patterson, in July, 2004 for $3,400. Notwithstanding that sale, Kevin Mixon still races the Corvette, Audiotape: hearing held 3/17/08 at 11:20:02-11:20:30 (on file with the Court), and after the sale, Kevin Mixon continued to pay expenses for the Corvette. *Id*. at 11:26:57-11:27:36.

omissions to be acts of willful tax evasion with respect to the taxes at issue. However, the Court does find that these omissions evidence, at the very least, a continuing lack of candor on the Mixons' part and are relevant evidence in assessing the Mixons' credibility and intent.

The Honda motorcycle was nearly twenty years old at the time this bankruptcy case was filed, and Kevin Mixon testified without contradiction that it is "in pieces." Kevin Mixon also testified that he purchased the golf cart in 1996 or 1997 for $300. However, as noted earlier, Kevin Mixon paid over $1,000 to have the golf cart rebuilt – indicating that it is worth at least that much to the Mixons. Audiotape: hearing held 3/17/08 at 11:35:39-11:36:32 (on file with the Court). The golf cart is not disclosed on his bankruptcy schedules or in any of the Forms 433-A the Mixons provided to the IRS over the years. The vacation club with Royal Holiday Club (the "Club"), appears not to be transferrable and Kevin Mixon testified that there is therefore no market for that asset. In fact, when asked what benefits he has obtained from the Club, he testified:

> honestly, nothing. Big headache. Pain in the butt. We did, when we went to Italy, we did use their Sheraton hotel agreement to stay while we were in Italy . . . the Cabo San Lucas trip to Mexico was also an all-inclusive trip again. I don't remember the dates we were in Cabo.

Audiotape: hearing held 2/8/08 at 3:05:16-3:06:16 (on file with the Court). The Court first observes that the trip to Cabo San Lucas was *not* all-inclusive since, as noted above, Colour Quest, Inc. paid for a plane ticket to, and rental car in, Cabo San Lucas. Moreover, Colour Quest paid for this travel in the same month that the Mixons submitted the OIC to the IRS on the alleged basis that they were unable to pay their tax debt. The Court also observes that while Kevin Mixon testified that he has not received any significant benefits from membership in the Club, he purchased his membership in March of 2000 for approximately $30,000, continued to make monthly payments towards that sum

throughout the years and has traveled internationally several times using its benefits (to at least Italy, Cabo San Lucas and Cancun). He has also renewed his membership in the Club post-bankruptcy, Audiotape: hearing held 3/17/08 at 11:03:36-11:04:06 (on file with the Court), indicating that the Club is something more than a "big headache."

These omissions from the schedules are troublesome, if relatively small. While they would not be sufficient, standing alone, to constitute evidence of willful tax evasion, the Court finds that this is a case in which the whole is greater than the sum of its parts. These omissions, when viewed in conjunction with the Debtors' (1) failure to make any payments on their 1999, 2000 and 2001 taxes, (2) failure to make estimated tax payments, (3) improper use of automatic extensions of the deadline to file tax returns, (4) false statements in the financial information given either to the IRS or to other creditors, (5) hiding of income, and (6) use of corporate accounts to pay personal expenses, lead the Court to conclude that the Debtors have willfully evaded their tax obligations and thwarted IRS collection efforts.

In coming to its conclusion that the Debtors have willfully evaded their tax obligations and thwarted IRS collection efforts, the Court has carefully considered, but now rejects, the Mixons' explanations. The Mixons' primary explanation for their complete failure to pay taxes is that Colour Quest's largest customer, Stroud's, Inc., filed for bankruptcy in September of 2000. *See* Def. Ex. 8A. Colour Quest was listed on Stroud's schedules as being owed approximately $247,000. Def. Ex. 9. Moreover, Stroud's filed an adversary proceeding against Colour Quest in December of 2001, seeking the return of approximately $400,000. The Mixons assert that the Stroud's bankruptcy filing was "devastating" to their business and left them unable to pay their taxes. Kevin Mixon further testified that his business was very substantially affected by the events of September 11, 2001. While

it is clear that both Colour Quest and the Mixons' subsequent income were adversely affected by both events, the Court does not find the Mixons' explanation for their complete failure to make *any* tax payments for 1999, 2000 or 2001 to be persuasive.[21]

*After* Stroud's filed for bankruptcy, Kevin Mixon purchased at least the following assets: a 1996 Porsche 911 Turbo, obligating himself to make monthly payments of $1,466.14 (purchased in October 2000, Gov't Ex. 12); a 2001 Chevy Suburban, obligating himself to make monthly payments of $745.82 (purchased in November, 2000, Gov't Ex. 38); a 1996 Beaver Patriot RV for the sum of $249,762.50, obligating himself to make monthly payments of $1,952.59 (purchased in December, 2000, Gov't Ex. 34); the additional acre from his neighbor, obligating himself to make monthly payments of $279 (purchased in July, 2002); a renewal of the Club membership, obligating himself to make monthly payments of $166.52 (purchased in December, 2002 during a trip to Cancun, Gov't Ex. 60); a new 2003 Chevy CK2500 Silverado Pickup truck, obligating himself to make monthly payments of $652 (purchased in June, 2003 for nearly $40,000, Gov't Ex. 41). Four months after giving the OIC to the IRS, Jamie Mixon purchased three Honda all-terrain vehicles, obligating herself to make monthly payments of $322, because she "thought it would be something fun for the family," notwithstanding the fact that the Mixons owed, at the time, over $500,000 in tax liability. Audiotape: hearing held 3/17/08 at 12:46:42-12:47:06 (on file with the Court); Gov't Ex. 37.[22]

---

[21] Kevin Mixon testified that the Mixons were at times behind on their mortgage, unable to pay utility bills, and had several vehicles (including the Beaver Patriot RV) repossessed for nonpayment. While the Court does not find Kevin Mixon credible (for reasons noted elsewhere), it does appear that the Mixons have had financial difficulties at times that have rendered them unable to make certain payments. However, the Court notes that the IRS is the *last* creditor the Mixons have ever considered paying. They have apparently found the funds to become current on their $4,400 per month mortgage and to incur significant discretionary expenses over the years.

[22] Jamie Mixon purchased these ATVs on the strength of a credit application submitted to Honda Financial Services dated October 18, 2002, which stated that Jamie Mixon had been employed for 8 years by Colour Quest, Inc. as a "sales service rep," and had monthly income of $30,000. Gov't Ex. 37. This application was signed 4 months after

565c8ae5e08667bf

The Mixons argue that none of their purchases of numerous vehicles (and the additional acre behind their home) during the years they were not paying their income taxes is significant, because they did not put any money down on any of the vehicles, instead using a perpetual cycle of trade-ins and vehicle financing to fund their purchases. What the Mixons choose to ignore with this simplistic argument is that each purchase of a vehicle obligated them to make monthly payments - with funds that could otherwise have been used to pay taxes at a time when the Mixons were paying none.[23] In fact, when the Debtors filed the Case, their Schedule J disclosed monthly payments for vehicles totaling $2,875.[24]

The Mixons' explanation for their purchase of numerous vehicles while they were not paying taxes also rings hollow. Kevin Mixon explained away the vehicle purchases as an error of youth, as follows:

Q:    From the time you bought your house, which I believe was 1998, up until the date of bankruptcy, can you think of any asset that you purchased that had a significant down payment or equity?

A:    No, I would have to say that everything that we bought was on credit. There was lots of financing available. If we had a vehicle, we would a lot of times trade it in on another one. I'm embarrassed. You know, when I look at this and I see the one thing I could have done differently in this – these cars were stupid. They were like rabbits, one would get another one and they would expand and it's a really embarrassing situation and it had gotten out of hand.

---

Jamie Mixon signed the OIC claiming that the Mixons had a combined monthly income of $10,000. On either the Form 433-A given to the IRS or on the credit application to Honda, Jamie Mixon was lying.

[23] In June, 2001, the Mixons purchased a 2001 trailer for $4,039.25. Gov't Ex. 49C p. 50. They charged this purchase to David Mixon's American Express account using the card in Kevin Mixon's name, and the bill was paid the following month. *Id*. At p. 57.

[24] While this evidence does not speak to the Debtors' conduct during the tax years at issue, it does shed light on the Debtors' intent – *i.e.*, whether the Debtors' failure to pay their taxes was, and continues to be, volitional. In light of the Debtors' history of making payments on numerous vehicles, an expensive home, travel, and discretionary expenses, in lieu of making estimated tax payments or payments towards their outstanding tax liabilities, it is hard for the Debtors to now argue credibly that they were simply unable to make tax payments during the tax years at issue.

> And I was locked into the payment and the debt with no equity - the kind of life lesson you learn, no one can tell you that.

Audiotape: hearing held 3/19/08 at 2:32:32-2:33:32 (on file with the Court). However, the Court notes that in January of 2006, just two months after the Mixons filed for bankruptcy in November of 2005 (disclosing that they had no income and just $10.57 cash), the Mixons purchased a 2001 Ford Excursion for $8,000 or $9,000 in cash. Audiotape: hearing held 3/17/08 at 10:47:43-10:47:55 (on file with the Court). In March of 2007, Kevin Mixon purchased a 2006 Audi station wagon for over $30,000, obligating himself to make monthly payments of $528. Gov't Ex. 35. At the time the Mixons made these purchases, they had not made any tax payments at all for the tax years at issue (1998 - 2001), or for 2003, 2004, 2005 or 2006. In fact, they did not even file tax returns for 2005 or 2006 until shortly before trial. While this evidence is not directly relevant to conduct which occurred during the tax years at issue, it does shed an unfavorable light on the Mixons' explanations for their continuing purchases of assets despite their alleged inability to make any tax payments for the tax years at issue.

A debtor's practice of fueling an extravagant lifestyle in lieu of paying income tax is a reason to deny the debtor's taxes from being discharged under 11 U.S.C. § 523(a)(1)(C). *See In re Jacobs*, 490 F.3d 913 (11th Cir. 2007) (the "conduct" element of Section 523(a)(1)(C) is satisfied by large discretionary expenditures when the debtor knew of his tax liabilities, was capable of meeting them, but did not); *In re Gardner*, 360 F.3d 551 (6th Cir. 2004) (debtor's lifestyle, which included numerous golfing trips, vacations to Europe and the Caribbean, and the expenditure of $25,000 to maintain country club memberships, supported denial of tax discharge); *In re Zimmerman*, 353 B.R. 310 (S.D.

Fla. 2006), *aff'd* No. 06-15151, 2008 WL 161423 (11th Cir. Jan. 18, 2008) (debtor's lavish lifestyle and transfer of assets without consideration evidenced willful tax evasion).

### B. Mental State Element

#### i. Duty to Pay and Knowledge of Duty

Both Debtors had both a duty to pay taxes and knowledge of that duty. They acknowledged as much during their sworn testimony at trial, and they reported liabilities on their federal tax returns for each of the tax years at issue. *See, e.g.*, Audiotape: hearing held 3/17/00 at 12:45:06-12:45:16 (on file with the Court).

#### ii. Voluntary and Intentional Violation of Duty

The preponderance of evidence adduced at trial, together with the inferences to be drawn therefrom, proves that the Debtors voluntarily and intentionally violated their duty to pay taxes for purposes of Section 523(a)(1)(C). This is a case in which the conduct itself is circumstantial evidence of intent. Much of the conduct described throughout this Memorandum Opinion supports a finding of a voluntary and intentional violation of the Mixons' duty to pay their taxes and evidences a willful evasion of payment and/or collection of the taxes owed for the tax years at issue.[25] Further specific examples of the circumstantial evidence supporting the Court's finding of willfulness include:

---

[25] The Court makes this finding with respect to both Kevin Mixon and Jamie Mixon. The Court notes that Jamie Mixon signed the tax returns at issue, establishing her knowledge that the taxes were due but unpaid. She signed many of the checks written on the corporate accounts. She signed the bankruptcy schedules, and the OIC given to the IRS, along with the corresponding Forms 433-A. She signed the contract to buy the additional one acre, about one month after she signed the OIC stating the Mixons could not afford to pay their taxes. She signed the power of attorney form appointing Robert Wilson to act as the Mixons' agent in dealing with the IRS. She purchased the Honda ATVs in her name, using a credit application which stated that she earned $30,000 per month working for Colour Quest for the prior eight years. On each of her tax returns from 1998 through 2003, Jamie Mixon identified herself as a "homemaker." In 2004, she identified her occupation as "housewife."

(i)      acquiring and enjoying expensive assets in the face of serious financial difficulties, such as the 1.168 acre tract they purchased just a month after they were attempting to have the IRS accept an offer in compromise on the basis of their inability to pay their taxes (which asset they also failed to disclose to the IRS in subsequent financial statements);

(ii)     offering $165,000 in June 2002 to settle their $500,000 income tax liability on the basis of inability to pay, when they could have paid substantially more;

(iii)    spending money that could have been used to pay their federal tax liabilities on vehicles and leisure activities instead; and

(iv)     enjoying assets held in the name of a family member (David Mixon) and friends (Michael Patterson) thereby reducing their collection sources subject to IRS execution.

**III.    Conclusion**

The totality of the Debtors' conduct distinguishes them from the "honest, but unfortunate" taxpayers for whom the bankruptcy discharge is reserved. *See Grogan*, 498 U.S. at 286-287. Based on the preponderance of the evidence, the Court concludes that the Debtors have willfully attempted to evade or defeat their 1998-2001 federal tax liabilities. Therefore, those tax liabilities are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).

### # # # END OF MEMORANDUM OPINION # # #